[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This decision begins the epilogue to the strange tale of Peter Gilbert. Taken into custody by Providence police on February 28, 1985, Peter Gilbert soon became a pampered state's witness in the prosecutions which led to the conviction of the plaintiffs in these post-conviction proceedings under G.L. 1956(1985 Reenactment) §§ 10-9.1-1, et seq. Gerald S. Mastracchio was convicted of the murder of Richard S. Valente ("The Valente murder trial") and John Broccoli and Lawrence Mastrofine were convicted of the robbery of the Gasbarro liquor store ("the Gasbarro liquor store robbery trial"). All convictions were affirmed on appeal. State v. Mastracchio, 546 A.2d 165 (R.I. 1988), opinion after remand 605 A.2d 489 (R.I. 1992); State v.Mastrofine, 551 A.2d 1174 (R.I. 1988). Peter Gilbert's death in June 1988 on the way to a sky-diving appointment in an automobile carrying contraband cocaine triggered a deluge of public comment and resulted in an internal investigation by the Attorney General (the "Gorman report"), a full-scale administrative investigation of police activity by a municipal special counsel appointed by the Mayor of Providence (the "McGuirl investigation"), and the appointment of a state special counsel by the Governor and Attorney General. The state special counsel presented evidence to a state-wide grand jury which returned some indictments, none of which resulted in convictions.
I. THE FACTUAL BACKGROUND
A. THE AGREED FACTS
The parties have executed an agreed statement of fact, some of which are arranged chronologically and others are grouped topically. The following summary is arranged more or less topically for convenience.
Family visits. During an early period of his confinement, from May until August 1985, Peter Gilbert lived with his wife and her children at the Providence police station, until she and the children relocated to Florida. She returned to Providence and visited with him for one week on November 8, 1985. They visited in Rhode Island again from December 20, 1985 through January 2, 1986, and from March 27 to April 7, 1986. On June 17, 1986 he flew to Florida to dispose of pending charges in accordance with a plea agreement he had with the Attorney General, and to spend time with his family at a hotel in Brooksville, Florida, returning to Rhode Island on June 20, 1986. He returned to Florida, accompanied by Providence police to visit his family from October 17 to 21, 1986.
The State rented a house in Narragansett for him to spend the Christmas holidays with his family from December 8, 1986 through January 5, 1987. His wife and her children were flown from Florida to join him in Narragansett. During this visit, on New Years Eve, a videotape was made in which he was filmed with Providence police stating: "The criminal justice system has been very, very good to us." On February 15, 1987, after testifying in the Gasbarro liquor store robbery trial, Peter Gilbert travelled to Florida to spend time with his family and returned to Rhode Island on February 19, 1987. On March 19, 1987 Peter Gilbert testified in the Valente murder trial.
According to the record and the agreed statement, by the time of the Gasbarro trial, Peter Gilbert had travelled to Florida on three occasions, once exclusively to deal with pending charges, once both to deal with charges and to visit with his family, and once exclusively to visit his family. By the time of the Valente trial, Peter Gilbert had added a fourth Florida trip to visit his family and, apparently, to try to buy a car.
The State does not dispute that all of these visits were well known both to the officers in charge of his custody and the prosecution team in the Attorney General's office.
Custodial recreation. Aside from the family visits, Peter Gilbert enjoyed some excursions from his quarters in the police station as set out in the agreed statement. He stayed at the Ramada Inn in Seekonk, Massachusetts from January 23 to February 3, 1987. He was moved to the Omni Biltmore Hotel from February 3 to February 15, 1987. Prior to his testimony in the trial of Gerald Mastracchio on March 19, 1987, he "was taken out on numerous outings by the Providence police including visits with his mother, grocery shopping trips, recreational outings, dinners at restaurants, trips to Quonset Point, Roger Williams Park, the Slater Park Zoo, the Scituate walking trail, Mystic Connecticut and to Lucielle's Hair Fashions and Hair Mania for haircuts. During that same period he was taken out to dinner by the police at Cricket's Restaurant in the Quincy Market, Boston.
The State does not dispute that all of the foregoing activity was known to the police officials in charge of Peter Gilbert's custody and to the prosecution team and its supervisors.
Peter Gilbert went sky-diving on February 21, 22, 28, 29 and March 7, 8, 14 and 15, 1987 before he testified in the trial of Gerald Mastracchio. After the trial he went sky-diving on the weekend of March 21 and 22, 1987. The Department of Attorney General reimbursed Peter Gilbert for expenses associated with his sky-diving during the period before March 19, 1987.
The issues of who knew or approved of Peter Gilbert's sky-diving, and when, are vigorously disputed by the parties.
Financial arrangements. In addition to financing the travels of Peter Gilbert and members of his family, checks in the following amounts were issued by the Department of Attorney General to the Providence Police Department for Peter Gilbert's living expenses during the six months prior to his testimony on March 19, 1987: September 18, 1986 — $2,000; October 29, 1986 — $2,000; November 11, 1986 — $2,000; December 1, 1986 — $2,000; December 17, 1986 — $4,000; January 9, 1987 — $2,000; January 29, 1987 — $2,000; February 26, 1987 — $2,000; and March 5, 1987 — $2,000. These checks total $20,000 and average more than $3,300 per month.
These checks were cashed by the Providence police, who disbursed cash to Peter Gilbert as he produced receipts to the police. The Department of Attorney General totalled these receipts but did not review the expenditures to determine whether they were reasonable. He was reimbursed for expenditures for jewelry and flowers. Peter Gilbert had cash in his possession while he was in custody prior to March 19, 1987.
On February 18, 1977 while Peter Gilbert was in Florida he borrowed $14,107.68 to purchase a 1987 Chevrolet Astrovan. When the Chevrolet dealership called the department of the Attorney General to verify Peter Gilbert's income, it was confirmed that he received income in the amount of $2,000 per month.
Peter Gilbert also collected welfare benefits beginning on March 19, 1985 while he was in custody. Members of the Providence Police Department cashed some of his welfare checks for him. This money was received by him in addition to the money he received from the Attorney General.
The sentencing agreement. Peter Gilbert was arrested by Providence police on February 28, 1985. On that date he provided the police with information on three murders and a robbery and agreed to cooperate with law enforcement authorities. The next day Providence police took his wife and her children into protective custody. Representatives of the Attorney General agreed to provide protection for him and his family on March 1, 1985.
Peter Gilbert was arraigned and held without bail on March 8, 1985. He testified before the grand jury on May 13, 1985. Sometime in January 1986 he entered into a written agreement with the Attorney General and Providence police, agreeing to a fifty-year sentence, forty suspended, ten to serve in the custody of the Providence Police Department, in return for his cooperation.
On June 17, 1986 he was sentenced in Florida to ten years confinement to be served in the custody of the Providence police. On July 21, 1986 he was similarly sentenced in Maine. In September 1986 Mr. Justice Cresto of this Court rejected the Attorney General's recommendation. The written agreement was amended to provide that Peter Gilbert would receive immunity for his testimony if the sentencing Court refused to accept the Attorney General's recommendation of ten years to serve.
B. DISPUTED FACT ISSUES
In addition to the agreed facts, the plaintiffs make a number of factual claims which are disputed by the State.
Before analyzing the disputed fact issues regarding Peter Gilbert's custody, the Court must consider Gerald Mastracchio's motion to re-open the evidentiary hearing for the purpose of receiving the grand jury testimony of James Bennett, Jr. The State objects on the ground that the testimony must be excluded as hearsay under R.I.R. Evid. 802. The plaintiffs argue that R.I.R. Evid. 804(b)(1) applies because the declarant was not available as a witness at the hearing and the State had a similar motive and interest to develop his testimony before the grand jury as it would have had at the hearing.
Both parties cite the same case, but at differing appellate levels. The State cites U.S. v. Salerno, 505 U.S. ___, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). The plaintiffs cite the same case on remand, 974 F.2d 231 (2nd Cir. 1992). The first test applied by the Court of Appeals on remand was whether or not the same issues were before the grand jury as were before the later tribunal. 974 F.2d, at 238. The Court examined what examination in fact occurred at the prior proceeding, and, if that inquiry was not conclusive as to the examiner's motive and interest, then the Court considered whether a reasonable examiner under the circumstances would have had the same or similar motive or interest to develop the witness' testimony. Id., at 239.
It is plain that the State was developing the same issues at the grand jury as were being explored at the hearing: the true facts regarding Peter Gilbert's custody by the Providence police. The objectives of the inquiries may have been different, but the issues were not. The initial grand jury examination of Mr. Bennett on August 3, 1990 extends for nearly 60 pages of typed transcript. The State's attorney carefully exposed the witness' criminal record. He pressed the witness for details as to each of the incidents the witness testified about. He required that the witness name others who he claimed were present at each material occasion. At his second appearance on October 26, 1990, he refused to waive his privilege against self-incrimination and declined to answer any questions of substance. The Court is satisfied from the examination by the State's attorney that he had the same motive and interest in developing Mr. Bennett's testimony at the grand jury proceedings as the State's attorney should have had at the hearing.
The State's objections are overruled. The grand jury testimony of James J. Bennett, Jr. will be received in evidence as Plaintiffs' Exhibit 39A (August 3, 1990) and 39B (October 26, 1990).
 1. The circumstances of Peter Gilbert's custody.
a. Peter Gilbert's possession of a gun. The plaintiffs contend that Peter Gilbert had access to a pistol during his custody at the time of and prior to his testimony in the trials which resulted in their various convictions. They do not allege that his police custodians connived at his possession of a firearm while in custody, but they do claim that some of his police custodians knew about his access to a gun. They argue that if any of his police custodians knew about this weapon, the prosecution team was chargeable with this knowledge. They claim that, since Peter Gilbert's access to a pistol while in custody was a significant aspect of his confinement, the failure to disclose that access by the prosecution and Peter Gilbert's failure to disclose that fact during his sworn testimony describing the conditions of his confinement deprived them of due process at their trial.
The State challenges the credibility of the witnesses who testified that Peter Gilbert had access to a firearm at any time material to these proceedings. It denies that any knowledge of police custodians, who failed to report that knowledge to anyone in authority at the police department or to anyone on the Attorney General's prosecutorial staff, is chargeable to the prosecution team. It denies categorically that any member of the prosecution team, itself, had any personal knowledge of Peter Gilbert's access to firearms or that anyone else had any such knowledge. The plaintiffs do not contend that the prosecutor, himself, nor anyone on the Attorney General's staff assisting him, nor any superior officers in the police department in charge of Peter Gilbert's custody, nor any members of the department assisting the prosecutor had any such knowledge.
Who then do the plaintiffs claim knew anything about Peter Gilbert's access to a pistol? The plaintiffs point to the grand jury testimony of Dorothy Gilbert, Peter Gilbert's mother, and the testimony at the hearing of Debra Bowermaster, Peter Gilbert's former wife, sometimes referred to as "Debbie Gilbert," of Darlene Hilton, his sister, of Ralph Gilbert, Jr., his nephew, of Remo Ciarlo, a police station janitor, and of Russell Tweedley, a retired Pawtucket police detective.
By far, the most credible of all this array was Mr. Tweedley, whose memory as to the dates involved was not clear. He swore he never saw a gun in Peter Gilbert's possession. Around November 1986 he saw Peter Gilbert in a beverage establishment called Jan's Place in the custody of or escorted by Michael Donovan, a former Providence police officer who is since deceased. He testified that Peter Gilbert told him he had access to a .38 caliber snub-nose pistol. He made no mention of Peter Gilbert displaying a handgun at Jan's Place in the presence of Mr. Donovan, or any other Providence police officer.
Mrs. Susan Boucher, also, testified that sometime in the Fall of 1985 Peter Gilbert did mention to her that he had a gun. She recalled an incident at Jan's Place in Pawtucket involving Peter Gilbert at which his Providence police escort was present. She made no mention of seeing a pistol on Peter Gilbert's person.
Ms. Shawna Gilbert, one of Peter Gilbert's daughters, gave a statement to Captain Michael Urso, of the Rhode Island State Police, on December 28, 1989, in which she claimed that on March 3, 1987, while Peter Gilbert was "in the middle of a trial" (presumably in preparation for the trial of Gerald Mastracchio) she noticed that "he was carrying a small automatic revolver (?) on his person," as they were walking out of the Biltmore Hotel. On February 1, 1990 Shawna Gilbert recanted certain other portions of her earlier statement. On July 27, 1990 during the McGuirl investigation, she swore to the fact that on an occasion when she left the Biltmore Hotel with her father, Peter Gilbert, he was in possession of a "small" weapon "tucked on the side of his pants." She saw it plainly, she said. After June of 1987 she saw Peter Gilbert in possession of firearms at various places and times. It was also clear that in 1988, well after these trials he had a veritable armory in his "safe house." Since she was not called as a witness at these hearings, her testimony cannot be given substantial weight. Yet, it is clear that she did see something.
Mr. Ralph Gilbert, Jr. testified that sometime in 1985 he saw Peter Gilbert at Jan's Place with two "body guards," Michael "Mike" Donovan and Thomas "Tommie" Oates, both in plain clothes. On that occasion, he said, Peter Gilbert displayed a handgun tucked in the back of his pants, while he was "doing a dance." The witness described the weapon as a .38. He claimed that both Donovan and Oates saw the pistol. He also claimed to see the same .38 at the police station as well as another smaller one Peter Gilbert wore strapped to his ankle. Thomas Oates denied categorically ever having been in Jan's Place. Considering the inconsistent testimony of Mr. Tweedley and Ms. Boucher, the contradictory testimony of Mr. Oates, whom the Court finds to be a credible person, the witness' demeanor and manner on the witness stand, and the improbability of his testimony, the Court rejects this testimony of this witness as utterly unworthy of belief.
Mr. Remo Ciarlo testified that he has been working as a janitor at the Providence police station since 1955. Sometime in 1985 or 1986 he went into Peter Gilbert's apartment and discovered him playing with a gun, which he described as an automatic handgun. Peter Gilbert said words to the effect of "That's for my protection." There is no evidence that Mr. Ciarlo ever reported this incident to anyone in authority. Nor was any police custodian present while Mr. Ciarlo made his observations. The Court is reluctant to accord this witness' memory a great deal of reliability, but he did see something in that apartment that he now believes was a pistol. Perhaps he was over-anxious to be as helpful as he could to official investigators.
Mrs. Dorothy Gilbert's grand jury testimony was received in evidence at the hearing. She testified unequivocally that her son always carried a gun when he came to visit her. He referred to his pistol as his "little buddy", apparently to reassure her that he was able to protect himself. She testified that Mike Donovan knew about Peter Gilbert's gun, and told her that, "He needs a little protection." She also swore that the police matron Eva Diaz saw Peter Gilbert carrying a pistol.
Although Eva Diaz was called as a witness by the plaintiffs and although she freely acknowledged her friendly disposition to Debra Gilbert and her children, she never corroborated the grand jury testimony of Mrs. Dorothy Gilbert. Michael Donovan is no longer alive to dispute her testimony, given after she knew he was dead. Furthermore, it is not altogether clear that Mrs. Gilbert was referring to a time before the trials of these defendants, rather than to a time after Peter Gilbert obtained the use of a Jeep after March 1987. It does seem clear, nevertheless, that Mrs. Gilbert is doing more in her testimony than echoing Peter Gilbert's vaunted braggadocio. Eva Diaz' failure to corroborate Mrs. Gilbert's testimony and Mr. Donovan's unavailability do cloud Mrs. Gilbert's testimony, as does the lack of interested cross-examination before the grand jury.
Mrs. Darlene Hilton testified that, although she never saw a gun in Peter Gilbert's possession, on one occasion during a visit at their mother's house she did see him make suggestive gestures and comments. He claimed to have his "friend" or "buddy" with him, and, when asked why he was abroad alone without protection, he patted the side of his leg pointing to his ankle. It is not clear whether this visit occurred in 1986 or 1987. The Court was not impressed with this witness' credibility because she was plainly not sure of the date of this visit, and had to be led by counsel for one of plaintiffs before she concluded that the incident occurred in 1986. Also, one can understand Peter Gilbert's desire to reassure his mother that she had no cause to be alarmed that his custodians let him visit her unaccompanied, especially after the trials of these plaintiffs.
All of which brings us to Mrs. Debra Bowermaster, once Debra "Debbie" Gilbert, since remarried. She testified that, during the time she stayed with Peter Gilbert and their children in the "safe house" in Narragansett for five or six weeks over the Christmas Holiday in 1986, he kept a small handgun hidden in the back of a radio. She testified that the gun did not stay in the radio. Although she testified that she saw Peter Gilbert in possession of a gun while he was in the station house, the only specific time she could recall actually seeing a gun was at Christmas-time in 1986.
In spite of the infirmity of the credibility of some of these witnesses, the evidence fairly supports the conclusion that, at some time during his custody prior to the trials of these plaintiffs, Peter Gilbert had possession of at least one pistol. When and where those occasions were, and whether anyone in authority knew about them and when is a different set of questions.
b. Peter Gilbert's access to prostitutes. The space in the police station where Peter Gilbert was held in custody at all times pertinent to the issues raised in these proceedings was an apartment formerly used as a matron's quarters, consisting of a bedroom, a living room, a bathroom and a kitchen.
This apartment adjoined the cellblock on the third floor where female prisoners were detained in police custody after having been arrested. Matrons are female statutory officers in charge of the custody of female prisoners in the cellblock. SeeG.L. 1956 (1981 Reenactment) §§ 13-5-5 and 13-5-6. The door to the cellblock was immediately adjacent to the door to Peter Gilbert's quarters. In fact, the noise from the cellblock at night was the source of many of Peter Gilbert's unremitting complaints about his confinement.
Ms. Donna Godreau testified that on two occasions when she was being held in the cellblock she encountered Peter Gilbert in the cellblock. On the second occasion, she says that she was "dope sick", and Peter Gilbert brought her some valium and a marijuana joint. He bought her some baked shrimp and had her moved to a back cell. In return for all of this she performed oral sex on him through the bars of her cell. This Court finds this witness to be unworthy of belief.
The plaintiffs claim that Ms. Godreau's testimony is corroborated by that of Albert E. Norato. Mr. Norato was a member of the patrol bureau on light duty when he was detailed to the security unit protecting Peter Gilbert and his family from some time before May 1, 1985 to some time in September 1985. Mr. Norato's deposition during the McGuirl investigation was received in evidence at the hearing.
According to him, at first, he had developed a friendly relationship with Peter Gilbert, which eventually dissolved by the time Peter Gilbert shot pebbles with his sling-shot at passing traffic from the roof of the public safety building during Mr. Norato's watch.
There was one door with a glass window which separated Peter Gilbert's apartment from the entry to the female cellblock. As a consequence, according to Mr. Norato, Peter Gilbert was subjected to serious noise disturbance from the cellblock area. In addition, some of the Gilbert family's personal belongings were stored in some of the unused cells in the cellblock. It was necessary for Peter Gilbert to pass the cellblock area when he came and went from his apartment. It was inevitable that Peter Gilbert would have some interaction with the occupants of the cellblock.
Some of that interaction was clearly inappropriate and improper, as when Peter Gilbert pretended to be a janitor or a detective. He exchanged social amenities with female prisoners who were former drug customers. He was also able on one occasion to persuade Mr. Norato to prevail on an arresting detective to release a detained female prisoner charged with prostitution. The detective was never called as a witness by any party. Mr. Norato adamantly and categorically denied any knowledge that Peter Gilbert ever had any actual physical contact with any prisoners, let along engage in felonious sexual conduct. As to his speculation, or the rumors he may have heard, surely the plaintiffs cannot expect this Court to rely on that kind of evidence.
Ms. Pamela Ebner, a sometimes overnight prisoner in the women's cellblock, corroborated Mr. Norato's testimony that Peter Gilbert spent time in solicitous conversation with female prisoners. He gave her some cigarettes and bought her a cheeseburger on one of their three encounters. On cross-examination she acknowledged he never came into her cell.
Ms. Carolyn Houlihan remembered that at some time which could have been Spring 1987 Peter Gilbert bragged that he had had relations with prostitutes and had access to them any time he wanted to. On cross-examination she agreed that her encounter with Peter Gilbert might have been in the Summer of 1987.
Detective Sergeant Thomas Blessington testified that one night in the latter part of the Summer of 1985 he observed Peter Gilbert in the female cellblock. He noticed that Peter Gilbert was walking away from cell number 3 and zipping up his jeans. He believed that Debbie Bartholomew was locked up in that cell. The matron was in another room and the police officer protecting Peter Gilbert was in the kitchen of Peter Gilbert's apartment. Sergeant Blessington, who was then a juvenile detective, was understandably concerned about what he had seen. He prepared a written memorandum to Captain Powers, then the chief of detectives. That memo is lost.
Needless to say, Debbie Bartholomew was not called as a witness, nor does it appear that she was interviewed by Ms. McGuirl, the State Police, nor did she testify at grand jury.
Two witnesses, who were police matrons during the time Peter Gilbert was in custody at the police station, also testified. Neither Rose Hewitt nor Eva Diaz testified that Peter Gilbert had any physical contact with any female detainees, although Ms. Hewitt, since retired, did testify that on one occasion a female prisoner, presumably Donna Godreau, was moved to a "back" cell, given a pillow and blanket and had coffee and a sandwich brought in, presumably at Peter Gilbert's behest.
Mrs. Debbie Bowermaster testified that women locked up for prostitution would scream for Peter Gilbert when he came in. According to her, Peter Gilbert was banned from the women's lock-up because he was accused of having sex with a prostitute. Although it was not clear where or how she acquired this information, it could have come from Peter Gilbert himself, who would most likely have denied the accusation. In any event, it cannot be said that Peter Gilbert's former wife corroborated Donna Godreau's sex-through-the-bars story.
James Bennett's grand jury testimony about police officers' bringing prostitutes in to Peter Gilbert is worthless hearsay.
From all the testimony it was fairly common for Peter Gilbert to encounter females of prior acquaintance in or from the Providence underworld. Given his well-known talkativeness and solicitude he could be expected to engage them in friendly conversation. While these forms of contact were undoubtedly improper and inappropriate, it was only Sergeant Blessington, who was understandably otherwise perturbed by Peter Gilbert's usurpation of the telephone in the lock-up area, who made any remonstrance. The evidence appears to be that, from Peter Gilbert's point of view, his excursions into and through the female cellblock were compensation, even if sexually innocent, for the annoyance he had to endure from the night time noises from the cellblock area.
As to whether Peter Gilbert's nonsexual "access" to female prisoners was known to anyone in the police department above the level described as "peons" by Mr. Norato or to anyone on or supervising the prosecution team is another question.
c. Peter Gilbert's access to or use of unlawful controlledsubstances while in custody. A number of witnesses, including a police officer, Frederic Miller, and a former matron, Rose Hewitt, detected the smell of marijuana from Peter Gilbert's apartment. Officer Frank Moody testified to noticing a "strange" smell coming from the apartment. Mrs. Debbie Bowermaster testified that marijuana was lifted into their apartment by means of a string which ran out of the bathroom window and could be lowered to the ground. She testified that she could smell marijuana being smoked in the apartment, on one occasion in the company of a police officer, who, again needless to say, was not called by either side as a witness.
Mrs. Bowermaster in her testimony also accused a matron, Eva Diaz, of having supplied Peter Gilbert with marijuana. This accusation is more than a little strange, because Eva Diaz went out of her way to befriend Debbie Bowermaster, when she was Debbie Gilbert and her life and the lives of some of her children appeared to be in danger. Although Ms. Diaz was called as a witness for the plaintiff and was examined by counsel for each of them at the hearing, they all chose not to ask her about the marijuana. She did explain that the string outside the bathroom windows was used as a device to lift a letter from Peter Gilbert's brother in the ACI so she wouldn't have to bring it upstairs to the third floor.
Ms. Donna Godreau testified that Peter Gilbert gave her either five or ten valiums and a "joint" during one of her periods of detention. The Court has found Ms. Godreau to be of dubious credibility.
Peter Gilbert testified at the trials of these plaintiffs that he dealt in substantial quantities of drugs before his arrest and acknowledged that he, himself, used cocaine before his arrest. Ralph Gilbert, Jr. testified unequivocally in these hearings that he saw the now-deceased Officer Michael Donovan deliver a white powder to Peter Gilbert in the police station. He also testified that he saw Peter Gilbert "burning" something in a spoon and later on "shooting up" in the police station with a substance he kept in a bag in the top drawer of his dresser. He was uncertain as to whether he made these observations in 1985 or 1987 but he believed they occurred in 1985. On cross-examination he admitted that he told the State Police that he, himself, had "snorted a couple of lines" with Peter Gilbert. Debbie Bowermaster testified that a police officer brought a bag of white powder to Peter Gilbert in the police station, which she believed to be cocaine based on Peter Gilbert's background. The Court finds these witnesses not to be credible.
There is no evidence that Peter Gilbert's apartment was ever searched for contraband. In fact, Mr. Norato testified that the custodial officers regarded Peter Gilbert's bedroom as sacrosanct and they penetrated no further into the apartment than the kitchen area unless invited, even to go to the bathroom. Peter Gilbert, himself, was never tested for the presence of controlled substances in any of his body fluids during this period of his custody. All we have in this case is some highly equivocal but clearly suggestive testimony from Debbie Bowermaster and Ralph Gilbert, Jr. to confirm that Peter Gilbert used cocaine during his custody before the trials of these plaintiffs. The Court further rejects the inference suggested by the plaintiffs that, because of his previously acquired addiction, Peter Gilbert must have possessed and used cocaine during his custody before their trials.
James Bennett also testified that while he was staying in the apartment, Peter Gilbert was brought in on some personal errand. He testified that Peter Gilbert brought a "baggy" with some rolled "joints" in it, from which he gave Bennett four joints and some valium. Bennett, the avowed drug addict, of course threw them away unsmoked. His testimony does, nonetheless, strengthen the conclusion that Peter Gilbert obtained, kept and used marijuana during his custody. James Bennett also explained that he found a "rope" made out of knotted towels or bedsheets, tied to and tucked behind a heater at the window in the apartment bathroom, which he found to be usable in a drug transaction. His testimony tends to corroborate Mrs. Bowermaster's, but the Court does not accept the inference that Peter Gilbert used the rope to obtain cocaine.
While it is probable that Peter Gilbert smoked marijuana during the period in question, his use of cocaine is not so well established. What is abundantly clear is that the people who should have known one way or the other, his custodians, did not themselves know.
d. Peter Gilbert's consumption of alcoholic beverages. It was never any secret that Peter Gilbert kept and consumed beer in his apartment in the company of his police custodians as well as members of the prosecution team. He also used a liqueur known as sambucco in his coffee. It was also well known that from time to time he consumed alcoholic beverages, most often beer at beverage establishments. Debbie Bowermaster's tales of drunken episodes involving Peter Gilbert and some of his custodians have guarded credibility.
e. Peter Gilbert's freedom to leave the police stationwithout a police escort. The testimony is decidedly conflicting as to whether or not Peter Gilbert was allowed to travel at large or roam about the police station without a police escort before the trial of these defendants. The evidence is clear that Peter Gilbert's protective security was substantially relaxed after these trials, and was further relaxed after the Court permitted him to be confined in a "safe house" in June 1987. Witnesses who testify to observing a lack of custodial escorts in the Spring of 1987 may well be referring to conditions during the period of post-trial relaxation of security, when he was regarded as a "trusty."
Mrs. Dorothy Gilbert visited her son twice during the Summer of 1985. After that, according to her testimony, all of their family visits were at her home in Pawtucket. At least initially, he visited nearly every Sunday, and his police escort would "sit" in her backyard. She estimated that after "about three months" he began to visit "all alone by himself." Her time estimate was, of course, never tested by cross-examination. Her testimony that when he came to visit her he had a Jeep, which he obtained late in March 1987, is inconsistent to a degree with her testimony that unescorted visits began some time in 1985. She volunteered the observation that, "he was supposed to be locked up, but he could come and go as he wanted." No date or source is provided for that conclusion.
She also pointed out that there were some police officers that Peter Gilbert trusted, and some that he did not. According to her, among his "two or three good friends" were two officers who died (Michael Donovan and Daniel Calise) and a third whom she didn't know. Included among the officers whom he did not trust were Lt. Tamburini and Sgt. Oates, the superior officers in direct charge of his custody. Mrs. Gilbert's grand jury testimony is too indefinite and conclusory to give it very much weight.
Mrs. Debbie Bowermaster testified that Peter Gilbert was always accompanied by at least one police officer when he left the apartment while she was staying there. She was also quite clear, nevertheless, that during Peter Gilbert's visits to Florida his police escort did not stay close to him. Her observations were not that Peter Gilbert travelled unescorted, but that some of his escorts were not really protecting him when they left the station.
Ms. Susan Boucher testified that Peter Gilbert visited at her home on Park Street in Pawtucket without a police escort on many occasions after she moved there in July 1986. Although she dates these visits as beginning in July 1986, her testimony as to dates was shaky at best. Mr. Ralph Gilbert, Jr. testified to many visits to Middle Street during 1985 and to Park Street in 1986 and 1987 without a police escort. He also corroborated Dorothy Gilbert's testimony when he swore that he saw Peter Gilbert at his mother's on occasions without police during 1986 and 1987.
James Bennett, Jr. described how easy it was for him to sneak out of the matron's quarters with the connivance of Eva Diaz. This testimony is not relevant to Peter Gilbert's custody before the trials, when he wanted an appearance of a need for active protection. No one has suggested that Peter Gilbert ever sneaked out of the station unescorted.
In analyzing the evidence which concerns the question of whether Peter Gilbert was free to be at large unescorted in or out of the police station during the material time period a number of factors must be considered. The police officers assigned to his custody detail evolved into two classes: those who liked and were liked by Peter Gilbert and those who did not and were not. It is scarcely credible that the officers who shared a mutual dislike and mistrust with Peter Gilbert would allow him the slightest degree of unauthorized liberty.
As to those officers who developed a friendly, "trusting" relationship with Peter Gilbert, there are several good reasons that Peter Gilbert would not travel without their escort. First, there was no reason for Peter Gilbert not to take his "friendly" custodians along with him on his jaunts, as Mr. Norato so vividly describes them. The testimony about Jan's Place, whether or not reliable as to a gun in Peter Gilbert's possession, is uniform in asserting the presence of more than one police custodian. Mrs. Bowermaster's testimony is clear that Peter Gilbert returned from his late night travels with his police escort.
Second, the major avowed reason for Peter Gilbert's escort was to protect him from the revenge of his former underworld colleagues against whom he was expected to testify. Whether or not valid, the appearance of the reality of such a threat was important to Peter Gilbert. He could scarcely afford to have it come to be known that he could go about safely without official bodyguards.
Third, even the "friendly" officers could not know whether or not the apprehended threat was real. No matter how stupid or venal they might have been, the risk to their careers of anything more serious happening to Peter Gilbert than that he got drunk should have been obvious to them. They simply could not have afforded to allow Peter Gilbert to wander off on his own. The more relaxed custodial surveillance in Florida clearly evidences a lack there of this kind of concern.
Finally, it should have been ego-gratifying to Peter Gilbert to have a police escort, like a mayor or a governor, to protect him wherever he went. This would be especially true if there is any merit to testimony that Peter Gilbert and his escort got drunk together. It is also noteworthy that prior to March 1987 Peter Gilbert always had an authorized police escort when he went sky-diving. He did not sneak away from or evade his escort during these adventures. He used them.
A quite different question is presented as to whether any officers in authority or any members of the prosecution team knew about any abuses of Peter Gilbert's custody.
 2. Knowledge of the true circumstances of Peter Gilbert'scustody.
a. The Providence police. Chief Anthony Mancuso arranged with Attorney General Arlene Violet in March 1985 for custody of Peter Gilbert at the Providence police station. It was he who made the matron's quarters available and arranged for physical renovations necessary to make the quarters livable and secure. The day-to-day responsibility for custody and security of Peter Gilbert was assigned to Lieutenant Richard Tamburini. Chief Mancuso visited with Peter Gilbert and his wife frequently during the initial period of custodial arrangement. Patrol Officer Donald DePalma's testimony that the chief was in the apartment "practically every day" and stayed for an hour or so over coffee is probably an exaggeration. On cross-examination he conceded that he, himself, had seen the chief visit only five or six times, and that his source for any greater frequency was Peter Gilbert, himself.
Lt. Tamburini was in charge of the intelligence bureau of the Providence police, whose investigations had led to the arrest of Peter Gilbert. Peter Gilbert's custody was supervised directly by Lt. Tamburini. Originally, the officers detailed to provide personal security for Peter Gilbert came from the detective division, but, eventually, as time went by, officers from the uniformed divisions were assigned to the detail. Peter Gilbert's debriefing was conducted exclusively by officers in the intelligence bureau. It was officers from this bureau who accompanied Peter Gilbert to his court appearances and on his family visits out-of-state. Lt. Tamburini was assisted in his supervision of Peter Gilbert's custody by Sergeant Thomas Oates. There may also have been one or two other intermediate supervisors in the intelligence bureau with some responsibilities, but all the witnesses generally referred to Lt. Tamburini and Sgt. Oates as being in charge of the custody detail.
Detective Steven Cross was the detective assisting in the prosecution of the defendants in the Gasbarro liquor store robbery trial. He was part of the security detail from the Summer of 1986 thru January 1987. In February 1987 he was transferred to the detective division. He sat with the prosecutors during the trial of the plaintiffs Lawrence Mastrofine and John Broccoli. He was present in Court during Peter Gilbert's testimony at the preliminary hearing regarding promises and inducements and during the trial testimony. He did recall Peter Gilbert's testimony about how much money he got from the Attorney General. He did not recall hearing Peter Gilbert's testimony concerning his confinement to a three-room apartment.
b. The department of the Attorney General. Peter Gilbert's custody began during the administration of Arlene Violet and continued into the administration of James E. O'Neill, after the beginning of January 1987. Assistant Attorney General Michael Burns was responsible for prosecuting the charges against all of these defendants from the beginning of Peter Gilbert's custody. He was assisted by Ms. Helen McOsker Altomari, as a paralegal assistant, and by Detective Cross in the Gasbarro liquor store robbery case. The Valente murder case was a state police prosecution and Mr. Burns had no prosecution assistance from Providence police, nor did any member of the Providence police department testify at that trial.
The procedures for handling Peter Gilbert's expenses were established during the Violet administration. Ms. Pauline Dugas testified that she was the fiscal administrator of the department from May or June of 1985 until just before the new administration took office in January 1987. She testified that Peter Gilbert's expenses were reimbursed out of a State witness protection account, on which she could draw by vouchers.
Two kinds of payments were made. A police officer brought in receipts for expenses incurred in the custody of Peter Gilbert. When those receipts reached a certain amount, she drew a voucher and the State issued a check at first in the amount of $1000., later increased to $2000. She also drew vouchers for direct payment by the State to vendors like travel agencies for services or goods provided for Peter Gilbert. The latter vouchers had to be approved by Helen Altomari.
She may have questioned the propriety of some receipts especially for some jewelry because the price did "throw" her. She also would have questioned receipts from out-of-town. Although she identified Assistant Attorney General Burns as the person from whom she would have sought authority to reimburse questionable or questioned items, she could not specifically recall ever having any dealings with Mr. Burns about any matters. Her testimony was persistently phrased in the indefinite subjunctive mood.
She identified as in her handwriting an accounting worksheet attached to a copy of the State's response to the defendants motion for promises, rewards and inducements served in January 1986 on the defendants in the Gasbarro robbery case. Although that worksheet was current through December 26, 1985, it was never updated, nor was an updating ever requested. The worksheet is virtually incomprehensible, but no defendant ever sought clarification. It is clear there was minimal contact between the fiscal office and the prosecutors.
Ms. Dugas was succeeded by Mr. Raymond Petrarca, who took over charge of the non-legal functions of the Attorney General's office, after the change of administration in January 1987. He noticed that State funds were used to reimburse expenditures for alcoholic beverages, which he understood to be contrary to regulations generally applicable to State employees' travel expenses. He testified that he was told not to question the purpose or nature of any expenditure, but to determine only whether or not the receipts submitted by Providence police added up to an amount justifying an advance check of $2000. It is not clear whether this direction came from Assistant Attorney General Burns or Assistant Attorney General Parker, the witness' direct supervisor. He also noted that in January and February of 1987 he received receipts from the FAA which he understood were for Peter Gilbert's sky-diving training. Peter Gilbert's sky-diving was a topic of conference among the witness, Providence police detective Edwin Semper, and Assistant Attorney General Parker. According to the witness there was no "mystery" about Peter Gilbert's sky-diving.
Judge Edward C. Parker, of the Administrative Adjudication Court, testified that he could not recall giving Mr. Petrarca any particular directions regarding payments from the witness protection funds. He believes that the fund was "more or less managed" by the criminal division of the department headed by Assistant Attorney General "Jim" Ryan.
Assistant Attorney General Ryan testified that he authorized Peter Gilbert's out-of-state travel. He did not learn about Peter Gilbert's sky-diving until after his death. His testimony is a clear example of the lack of communication between the financial people in the department and the people responsible for prosecution.
Assistant Attorney General Burns began working on organized crime prosecutions at the beginning of the administration of Attorney General Violet in 1985. He first met Peter Gilbert a day or two after his arrest in the office of the intelligence unit of the Providence police department, but they did not talk at any length about the cases. Nor did he involve himself in the debriefing of Peter Gilbert during the next ensuing period, except to listen-in from time to time and to review statements. He believes he may have suggested a voir dire examination of Peter Gilbert by defense counsel prior to his testimony in the Gasbarro liquor store robbery, and, in any event, had no objection to such an examination. He visited Peter Gilbert in the police station apartment approximately a dozen times, and always found the doorway guarded. On at least one occasion he joined Peter Gilbert in consuming some beer in the apartment.
A supplemental answer to the defendants' discovery motion was signed by him, served on defense counsel and filed on January 9, 1986. That answer disclosed pending cases against Peter Gilbert in Florida and Maine and included an unexecuted memorandum of agreement between Peter Gilbert, the Department of the Attorney General, and the Providence police regarding sentence recommendations and custody. Also attached was the ledger sheet prepared by Ms. Dugas. The answer further itemized some other expenses incurred by the State for the protection of Peter Gilbert and his family.
It was his understanding that the police were paying bills for Peter Gilbert's expenses as they came due and were being reimbursed by the Department of Attorney General. He had no idea who was responsible for the reimbursement nor was it his responsibility to monitor receipts, which were left to "finance people and police."
Mr. Burns knew about Peter Gilbert's repeated complaints about his living accommodations in the Providence police station. According to the prosecutor Peter Gilbert complained about the noise from the female cellblock and the hostility of some police officers. He knew about Peter Gilbert's stay at the safe house in Narragansett for about one month just before the trials began. It was his belief that Peter Gilbert never went anywhere without a police escort. He testified without contradiction that he advised all defense counsel that Peter Gilbert had had a month-long family visit before he testified. He disclaimed any knowledge of Peter Gilbert's sky-diving before May 1988. According to the prosecutor he believed Peter Gilbert was moved to the Ramada Inn at Seekonk, Massachusetts to prepare for the Gasbarro hold-up trial because Peter Gilbert complained about his inability to get enough sleep in the police station apartment. He testified that it was understood at the trial that the specific locations where Peter Gilbert was held would not be addressed.
He heard Peter Gilbert testify about the money he was getting from the State. He had told Peter Gilbert about the figures he had got from Raymond Petrarca in the Attorney General's finance office. He denied telling Mr. Petrarca not to review incoming receipts submitted by Providence police for reimbursement. Nothing that Peter Gilbert testified struck him as untrue.
Detective Steven Cross sat with him at counsel table throughout the Gasbarro liquor store robbery trial. Detective Cross never said that Peter Gilbert was not telling the truth.
II. THE SENTENCE AGREEMENT
The first contention of the plaintiffs to be considered is their claim that the prosecution knowingly concealed the actual terms of Peter Gilbert's sentence agreement with the Attorney General. They also argue that the prosecution knowingly used Peter Gilbert's perjurious testimony with regard to his sentence arrangement with the State.
Soon after Peter Gilbert was taken into the custody of the Providence police, plea negotiations began between the Attorney General and Peter Gilbert. As part of those negotiations pending charges against him in Florida and Maine were disposed of during 1986 with concurrent ten-year sentences to be served in the custody of the Providence police. Also as part of the negotiations the Attorney General had obtained an agreement from a district attorney in Massachusetts that the same disposition would be recommended for a murder which Peter Gilbert admitted he had committed in that state.
Some time in late 1985 the Attorney General prepared a "Memorandum of Agreement", which does not appear from the record to have been formally executed, but which purported to represent the promises made by the Attorney General to Peter Gilbert. A copy of that document was furnished to counsel for Gerald Mastracchio during 1986. A copy with handwritten notations by Peter Gilbert was furnished to counsel for Lawrence J. Mastrofine and John E. Broccoli on January 9, 1987 during a preliminary hearing before Mr. Justice Orton in this Court.
The pertinent provision in the memorandum appears in paragraph 4:
 4. The State further agrees to continue sentencing for a presentence report until after the defendant testifies. If the defendant testifies truthfully when called upon, either at trial or any judicial proceeding or before any grand jury whether questioned by the prosecution, the defense, or the Court, the State will recommend a sentence of fifty (50) years, ten (10) to serve, with forty (40) years suspended and forty (40) years probation upon release. This recommendation will encompass each charge and will run concurrently. This condition is in no way based on success at trial but rather on the defendant's truthful testimony and cooperation throughout any proceedings.
When the proposed recommendation was presented to Mr. Justice Cresto of this Court in September of 1986, he declined to approve it. He insisted that sentencing be for any term of confinement, but subject to a "cap", or upper limit of twenty years of confinement. By the time of the preliminary hearing on the questions of promises, inducements or rewards to Peter Gilbert for his testimony before Mr. Justice Orton, in January 1987, the Attorney General had agreed that, if no justice of this Court were to approve the disposition in the memorandum, the Attorney General would seek immunity from prosecution for the defendant from the Presiding Justice. When he was called initially as a witness at the trial of Lawrence Mastrofine and John Broccoli before the jury, on January 30, 1987, Peter Gilbert did invoke his privilege against self-incrimination and was immunized by the Presiding Justice.
Peter Gilbert insisted in his testimony at the trials of these plaintiffs that he had no different understanding with the Attorney General with regard to the length of his sentences from that described in the memorandum. The plaintiffs now argue that Attorney General Arlene Violet had promised that she would consider reducing the ten-year period of confinement to eight years after Peter Gilbert's testimony. They also suggest that Peter Gilbert was not testifying truthfully when he swore that his handwritten notes represented his "wishful thinking" rather than commitments actually made by the Attorney General with regard to a "safe house".
Neither Attorney General Violet nor O'Neill was called as a witness in these proceedings by any party. The only witnesses who testified about a proposed reduction in the length of Peter Gilbert's confinement were former Chief Mancuso, Commander Tamburini and Sergeant Oates.
Sergeant Oates testified that at some time he discussed with Peter Gilbert, the prospects of a reduction in confinement that he had heard about from Lt. Tamburini. He had never been present, himself, at any conversation among Peter Gilbert, any attorney general, and Lt. Tamburini. All of his understandings were derived at second-hand, either from Peter Gilbert or Lt. Tamburini. He also testified that, after the Valente trial, either Mr. Burns, the prosecutor, or Ms. Altomari, his paralegal assistant, undertook to see if Peter Gilbert's sentence could be reduced. For some reason, most likely the expiration of time for a sentence reconsideration under Rule 35 of the Rules of Criminal Procedure, which suggests that this inquiry took place more than 5 months after Peter Gilbert's sentencing on March 30, 1987, a reduction was not possible. The plaintiffs suggest that this inquiry was motivated by a commitment from Attorney General O'Neill to carry out promises made by Attorney General Violet. Sergeant Oates was clear that all of the conversations he was aware of regarding the reduction of Peter Gilbert's term from ten to eight years occurred after the trials in which these plaintiffs were convicted.
Commander Tamburini testified that, some time in 1986, Peter Gilbert met with Attorney General Violet, in the presence of himself and Chief Mancuso, at which time Attorney General Violet made no promises regarding sentencing other than that she would honor the written agreement. At this meeting according to Commander Tamburini, Peter Gilbert requested a lower term of confinement, and Attorney General Violet agreed to consider his request. Commander Tamburini was clear that Peter Gilbert was not presented with any sentencing recommendation during his meeting with Attorney General Violet. That agreement was presented to Peter Gilbert by Michael Burns at the police station early in 1986.
According to Commander Tamburini, on January 21, 1987, Peter Gilbert met with Assistant Attorney General James Ryan, the chief of the criminal division of the department of attorney general under the newly-elected Attorney General O'Neill. Peter Gilbert wanted to be reassured that the new Attorney General would carry out the promises made by the former one. Assistant Attorney General Ryan assured Peter Gilbert that Attorney General O'Neill would live up to the promises in the written agreement.
Commander Tamburini testified unequivocally that sentence reduction was never even brought up at this conference. He also was certain that the Attorney General's commitments were conditioned upon Peter Gilbert giving truthful testimony. No such promises depended on successful testimony.
The subject of a promise of consideration of a reduction to eight years of Peter Gilbert's confinement did not come up according to this witness until a meeting attended by Chief Mancuso, the witness, Attorney General O'Neill, and Assistant Attorneys General Ryan and Burns on May 22, 1987, after Peter Gilbert's testimony in the Gasbarro and Valente trials. The Providence police officers insisted that Peter Gilbert had been promised such consideration. The Attorney General agreed to consider some kind of alternative to a sentence reduction. Commander Tamburini testified that the safe house was provided as an alternative to the eight-year confinement, when the Attorney General found out that Peter Gilbert was not eligible for a sentence reduction or earlier parole.
Assistant Attorney General James Ryan recalled being present at a conference with Chief Mancuso and Lieutenant Tamburini at which there was discussion about a sentence reduction which had been talked about with Attorney General Violet. According to Assistant Attorney General Ryan it was the police who felt obligated to pursue the subject of a sentence reduction. He had no recollection that at an early meeting in January 1987 Peter Gilbert had told him that Attorney General Violet had promised a sentence reduction. In any event, Mr. Ryan made clear at the time that Attorney General O'Neill would honor only the written agreement.
Assistant Attorney General Burns testified that the sentence agreement was finally arrived at by Attorney General Violet in January 1986. He personally drafted the written memorandum of the agreement, to which Peter Gilbert agreed but never signed. During 1986 Peter Gilbert requested that he get a "Ferle" deal in which he would be accorded the same disposition as William Ferle, who was placed in a safe house and protected and supported there together with his family at state expense. In fact, efforts were made during 1986 to get Peter Gilbert into a Federally-funded witness protection program. Mr. Burns testified that Peter Gilbert was truthful when he swore that the hand-written notes on the typed sentence memorandum were his wishful thinking and did not reflect any promise made to him. Mr. Burns also denied that any promise had been made to Peter Gilbert to reduce his confinement to eight years. In fact, at the time of these trials, it was not even likely that any judge would approve the ten-year term.
On June 25, 1987, Mr. Justice Orton ordered that Peter Gilbert could be transferred from his incarceration at the Providence police station to an undisclosed safe house. According to Mr. Burns the primary motivating force to move Peter Gilbert out of the police station came from the chief who was beginning to find that the continued custody of Peter Gilbert was causing personnel and financial problems for the department.
The Court is satisfied that Peter Gilbert was never promised a reduction of sentence, or that any reduced sentence would be recommended by Attorney General Violet. It is simply incredible that Peter Gilbert would not have included such a promise in the wish list he wrote on his copy of the written disposition agreement. It may well be that at some point Chief Mancuso and Lt. Tamburini proposed to Attorney General Violet that she consider recommending eight years instead of ten. She may have tactfully told them she would consider their request. From that kind of conversation Commander Tamburini might well believe that she had promised Peter Gilbert that she would consider a sentence reduction. Commander Tamburini might well have conveyed that impression to Sergeant Oates and Peter Gilbert himself. Later on, when the Providence police were eager to get Peter Gilbert out of the station, after the trials with a change in administration, this promise was a useful devise to persuade Attorney General O'Neill to agree to a safe house plan.
Considering all of the evidence, the plaintiffs have not proved that the Attorney General promised Peter Gilbert to consider a reduction in the term of his confinement if his testimony was successful. In fact, the only promise Peter Gilbert had at the time of the trial of these plaintiffs was the one he had in writing that the Attorney General would recommend ten years of confinement in the custody of the Providence police department. The evidence does not support any conclusion that the prosecution knowingly, or otherwise, withheld or concealed its true sentencing agreement with Peter Gilbert. The evidence also fails to prove that Peter Gilbert perjured himself at these trials when he swore that the Attorney General promised to recommend that he be sentenced to confinement for ten years, and that if no judge of this Court approved that disposition he would be immunized.
III. THE FINANCIAL ARRANGEMENT
The State's pretrial disclosures to the defense in the Gasbarro liquor store robbery case regarding the financial benefits received by Peter Gilbert during his custody came in three phases.
On January 9, 1986 the State made a comprehensive, if not completely comprehensible but nevertheless meticulously accurate, written disclosure of the expenditures laid out by the State.
On October 31, 1986 a distinctly less comprehensive, but more comprehensible and more ambiguous, further written disclosure was made. The disclosure that Peter Gilbert had been provided with approximately $1500 to $1800 per month for living expenses for himself and his family was essentially accurate as of the date of the disclosure.
On January 9, 1987 Peter Gilbert was shown a copy of the supplemental response which disclosed his receipt of "approximately" $1500-$1800 per month for "living expenses" for himself and his family. He testified that that was "pretty close" to the amount he had been receiving. State v. Kenneth Silva. etal, No. Pl/85-0580, Transcript, Vol. II, p. 229, (henceforth simply "Silva Trans."). What he did not disclose in his testimony was that during the preceding December the State had disbursed $6,000 for his "living expenses," which, of course, dramatically skewed the monthly average upwards.
Peter Gilbert testified on cross-examination that he paid no income tax on the money he got. He claimed he did not pay for his food, but that the Attorney General's office did. Someone, he said, shopped for him and the Attorney General's office gave them the money, not he. He swore: "I don't see the money. When I need groceries the money is made available to buy groceries." SilvaTrans., p. 259. It was brought out on cross-examination that Peter Gilbert was relying on the information provided by the Department of the Attorney General to come up with the amounts he received. He disclaimed any actual knowledge of how much was being expended: "I don't know what the tab comes to at the end of the month. I don't know." Silva Trans., p. 339.
On cross-examination he acknowledged a weekly welfare benefit of approximately thirty dollars. Silva Trans., p. 346. He further testified: "Whenever I need something, food or whatever, I let one of the Intelligence Bureau know and they get the money from the Attorney General's office and they take care of it."Silva Trans., p. 349. Shown portions of the January 9, 1986 disclosure by the State about sums expended during 1985, he was not able to explain the items with complete confidence. SilvaTrans., p. 365.
Based on Plaintiffs' Exhibit 9, the Rhode Island State Police summary of the receipts submitted on behalf of Peter Gilbert for reimbursement, a total of 481 receipts amounting to $10,432.40 were submitted for 1985, and 1653 receipts amounting to $33,757.49 were submitted for 1986. The total for both years comes to $44,179.89. According to the Exhibit, however, during the same period the Attorney General submitted vouchers for advances amounting to $41,000, over a period of 22 months. The Court computes an average monthly disbursement of $1,864 for the entire period, even with the disbursement of $6,000 in December 1986.
Peter Gilbert's testimony, derived from information provided to him by the prosecution, that he received an amount between $1500 and $1800 per month during his custody is neither perjured nor inaccurate. The failure to disclose a receipt of $6,000 during the month just before his testimony and of $2,000 on the first day of his testimony may have been somewhat misleading.
His testimony that others paid for his necessaries and that he did not receive any cash from the Attorney General was decidedly false and misleading. The evidence establishes that by January 1987 he was receiving some cash from his police custodians for receipts he turned over to them and that neither the police officer who was responsible for getting checks from the Attorney General nor the agent of the Attorney General who was responsible for issuing vouchers ever audited those receipts. The testimony was misleading only because Peter Gilbert's possession of cash was inconsistent with his description of his custody as being severely confining. If he had been as confined as he suggested, he would have had no need for cash. The plaintiffs were, of course, well aware that Peter Gilbert did receive a small amount of cash from his welfare checks. SilvaTrans., pp. 346-48.
The Court is satisfied that Assistant Attorney General Burns and his police assistant, Detective Cross, as well as Ms. Altomari, all honestly believed that Peter Gilbert was telling the truth when he testified that he did not see any cash from the reimbursement checks.
At the trial of Gerald Mastracchio for the murder of Richard Valente, on March 19, 1987, Peter Gilbert re-iterated his previous testimony that he thought he got approximately $1500 to $1800 per month from the Attorney General to take care of his children, his wife and himself. State v. Mastracchio,
P1/85-3173A, Transcript, Vol. I, p. 171 (hereinafter simply"Mastracchio Trans."). He went on to say, as he had previously, that whatever bills were incurred were paid from that amount, but he didn't get any of it in cash. Id., p. 172.
The Court is impressed with the testimony of Mr. Dale Anderson, who represented the plaintiff, Gerald Mastracchio, in the Valente murder trial, that he did not attach a great deal of importance to the amount of money Peter Gilbert was receiving for himself and his family from the State, because it served to buttress an impression of Peter Gilbert as a dedicated family man. Peter Gilbert seemed to Mr. Anderson to be in a 24-hour lock-up situation, so he would be in no position to know how much he was getting. He regarded the conditions of Peter Gilbert's custody as more material than the financial considerations. Although he did not say so, he might have been concerned by Peter Gilbert's possession of substantial sums of cash during his custody.
The State's disclosure and Peter Gilbert's testimony is also somewhat uninformative because the nature of all of the "living expenses" for which Peter Gilbert was being reimbursed was not disclosed. Some expenses were incurred which were plainly inconsistent with the strictly confined custody the testimony of Peter Gilbert would otherwise suggest.
While the Court can find no evidence that Assistant Attorney General Burns, or his paralegal assistant, Ms. Altomari, or his police assistant, Detective Cross, had any knowledge that Peter Gilbert was in fact receiving cash from his police bankers in January and March 1987, the Court is satisfied that Lt. Tamburini either knew or is fairly chargeable with that knowledge. The police officer in charge of Peter Gilbert's finances had no reason to believe he was doing anything wrong in disbursing cash to Peter Gilbert in return for receipts. Lt. Tamburini was also justified in believing that the financial people, at least, in the Department of the Attorney General probably knew that cash was being disbursed to Peter Gilbert in addition to what was expended by the police in his behalf.
This Court will not fault the prosecution in this case for not promptly realizing that Peter Gilbert was presenting misleading testimony and for not immediately grasping the import of his testimony about not receiving cash. The significance of Lt. Tamburini's knowledge and the conduct of agents of the Attorney General in the fiscal office on the question of whether or not the trials of these plaintiffs met minimal standards of due process under the constitutions of our State and Nation will be taken up later on. For now, the Court finds that Peter Gilbert's police custodians knew and the Attorney General should have known that Peter Gilbert received undisclosed cash from the disbursements for his living expenses.
IV. THE CONDITIONS OF CUSTODY
It is apparent from the evidence that some of the relaxed conditions of Peter Gilbert's custody were well known to the authorities in charge of his custody and some were clandestine, known only to Peter Gilbert, members of his family circle and a few "trusted" insiders in the police department.
Police authorities knew and the prosecutor could readily have found out and disclosed that Peter Gilbert engaged in extensive extra-confinement recreational activity.
Police and prosecution alike knew that Peter Gilbert had made at least two trips to Florida to visit with his family before the trials. Peter Gilbert's suggestion that the only times he travelled to Florida was for court appearances was misleading. The fact that his police escort was markedly relaxed during these trips was not disclosed. It is unescapable that these trips were forms of recreation at State expense to appease Peter Gilbert.
The plaintiffs were aware of the month-long family visit Peter Gilbert enjoyed in December 1986, and explored that activity in cross-examination in the Gasbarro robbery trial.Silva Trans., pp. 795-6, 798, 820, 822. The Florida visits nevertheless should have been disclosed to the defense so that their purpose might also have been explored. Mr. Anderson, accordingly, might have reconsidered his strategy in the Valente murder case of avoiding bringing out Peter Gilbert's family concerns, if he had known of the frequency and relaxed security of these visits.
Peter Gilbert visited his mother regularly. He roller-skated in the station corridors. He washed and polished autos in the police station garages. He went shopping. He went out to eat. He travelled to Newport and Boston. He went boating on Narragansett Bay. He visited parks and recreational facilities. He went sky-diving. He had money in his pocket to spend as he wished. He went bowling and to golf driving ranges. None of this was kept secret from his police custodians. He was invariably accompanied by a security escort. The plaintiffs were informed that Peter Gilbert had gone out to eat twenty-five to fifty times during the approximately two years he had been in custody. Silva Trans.,
pp. 335-6. They also knew that he had bought and consumed beer on some occasions. Id., p. 345.
From the perspective of hindsight, one might readily characterize this concept of confinement as bizarre. The failure of the police custodians to keep the prosecution advised was inexcusable. While the prosecutor is not personally chargeable with actual knowledge of the liberal conditions of Peter Gilbert's custody, the State, in whose name he prosecuted the indictments against these plaintiffs, plainly is. The Attorney General had delegated the State's responsibility for custody of Peter Gilbert to the Providence police department.
In addition to the recreational excursions by Peter Gilbert that were well known to police authorities, he engaged in some extra curricular exploits known only to him, in part to his wife, and in part to some of his favored and trusted custodians. Peter Gilbert roamed the public safety building, playing in the municipal courtroom and judges' chambers, and sling-shooting at passing motorists from the roof. He went on late night jaunts, some of which may have included stops at beverage establishments. He socialized with prisoners in the female lock-ups. He probably smoked marijuana in his apartment. He may have had possession of a pistol.
Although some of Peter Gilbert's clandestine, even criminal, activity while in custody was known to some police officers or matrons, it was never made known to, and was assuredly actively concealed from the superior officers, such as Chief Mancuso, Lt. Tamburini or Sgt. Oates, in the department in charge of Peter Gilbert's custody. While the knowledge or conduct of these subordinates at what Mr. Norato called the "peon" level might be chargeable to the State or a municipality in a civil rights tort action for damages, if they were carrying out State policy in the execution of the custody of Peter Gilbert, it defies reason to conclude that every police officer, police matron and stationhouse janitor is a member of the prosecution team obliged to disclose exculpatory evidence or to prevent perjury at the trial.
Part of the reason that these escapades were clandestine was that both Peter Gilbert and his renegade custodians knew that disclosure would spoil him as a State's witness. Peter Gilbert was intelligent enough to realize that his sentencing agreement was lenient enough without revealing that his custody had become purely nominal by the time of his testimony.
The plaintiffs contend that Peter Gilbert's testimony regarding the conditions of his custody was perjurious or so seriously misleading as to amount to a falsehood. He described his custodial arrangement in various ways:
(1) At the pretrial hearing in the Gasbarro robbery case on January 9, 1987:
 "Q. During any of this time have you at anytime been free of police control?
 A. For the last twenty-three months I have had a police officer with me twenty-four hours a day, every day."
 Silva Trans., p. 232
 * * *
 "Q. And did you get to go out and have dinner with your wife, things of that nature?
 A. In the twenty-three month period I can remember two specific occasions where I went to dinner with her with a police escort, as least three police officers."
 Id., p. 233
 * * *
 "Q. And I'm not asking for the address of where you live, but how many rooms do you have where you live?
 A. I live in a cellblock area."
 Id., p. 260.
 * * *
 "Q. Where did he tell you were going to be incarcerated?
 A. Exactly where I'm incarcerated right now. In the cellblock.
 Q. That is not in a prison, however?
 A. It's not quite as good as a prison. No.
 Q. Okay. You would rather be at prison?
 A. Well. You could sleep in prison."
 Id., p. 288.
 * * *
 "Q. By `custody' what do you understand that to mean?
 A. Well. So far it's been in a cellblock area without other prisoners. The same noise, et cetera."
 Id., p. 331.
 * * *
 "Q. It states, `While the defendant is remanded to the Providence Police custody, his freedom is restricted to that authorized by the Providence Police and in any event at no time during his sentence will he be' — I think that is without — `law enforcement detention.' What do you understand that paragraph to mean?
 A. It would be exactly what it was for the last twenty-three months, twenty-four hours a day with a police officer right near me.
 Q. Okay. so you understand that to mean that at no time will you be out of the presence of a police officer, that what you understand that to mean?
 A. To a reasonable extent. I can go to the bathroom by myself, Mr. Gonnella. The police officers are present all the time.
 Q. How about when you go to bed?
 A. There's a police officer right outside the door.
 Q. Paragraph ten states — if you would look at it, please, `The Providence police promise to use their best efforts to insure the defendant such custodial condition as will maximize the security of his person during his confinement and/or travel while in their custody.' What do you understand that to mean?
 A. Everywhere I go there are at least three police officers with me. As far as travelling, if I go to the dentist or a doctor, occasionally when I go out and eat.
 Q. Occasionally they are with you or occasionally you go out and eat?
 A. Occasionally I go out and eat.
 Q. But they are always with you when you go out and eat?
 A. Yes.
 Q. Do you go out and eat in public restaurants?
 A. Not too often.
 Q. But you have?
 A. Yeah.
 Q. How many times have you gone out to eat in a public restaurant, sir, since you have been in the custody of the Providence Police?
 A. Twenty-three months? I don't know, I have to take and rough guess, say fifty times, twenty-five times, I'm not sure.
 Q. Of those fifty to twenty-five times some of those times have been with your wife; is that correct?
 A. Yeah. As a matter of fact, it's been one time on my anniversary last November, it's the only particular time I went out with my wife to eat.
 Q. That is included in the twenty-five or fifty that you mentioned?
 A. I would say twenty-five or fifty. I didn't kept track of them, Mr. Gonnella.
 Q. I understand. Do you say that when you went out with your wife, police officers were present?
 A. Yes, they were.
 Q. Were they at the same table?
 A. One particular time when I went with my wife they were right at the next table. Three officers were at the next table."
 Id., pp. 334-6.
 * * *
 "Q. Have you been provided with any types of rules and regulations, either verbally or in writing, concerning your conditions of confinement while in the custody of the Providence Police, things you can do and things you cannot do?
 A. What I can do is pretty much limited. I'm locked up. I got cell bars in the window. I — two doors — three doors that are locked. I'm confined to a three-room area. That's my exercise. I don't have no exercise yards. I have continuous orchestration of cell banging screaming for twenty-three months, twenty-four hours a day, a nice place to live.
 Q. My question to you, sir, is whether you have been provided, either orally or in writing, with the rules or regulations that the Providence Police expect of you during your confinement in their custody?
 A. No, I haven't been given sheets of paper and this is what you can do and this is what you can't do. I haven't been given that.
 Q. Now, in addition, to going out to dinner twenty-five to fifty times during your twenty-three-month confinement at a public restaurant, have you had occasion during that twenty-three months to have food brought in to you?
 A. Oh, yes."
 Id., pp. 337-8.
 * * *
 "Q. While you have been in custody of the Providence Police have you had occasion to take any liquor, drink any liquor?
 A. I had a beer occasionally.
 Q. Tell us about when those occasions arose and how they happened?
 A. I bought — I bought a six pack of beer one time and maybe three or four other times I had a beer here and there.
 Q. Is that from a different six pack?
 A. Yeah. This is in the twenty-three-months that I been there."
 Id., p. 345.
 * * *
 "Q. While you have been in the custody of the Providence Police have you had occasion to take any drugs, illegal drugs?
 A. Illegal drugs?
 Q. Yes.
 A. No."
 Id., p. 349.
 * * *
 "Q. While you have been in the custody of the Providence Police Department have you had access to telephones, sir?
 A. Yes, I have.
 Q. Is that upon request?
 A. I'm allowed to call my children and speak with them in regard to their school work, et cetera.
 Q. Are you allowed to call other people?
 A. I can call my mother, my wife and children, some relatives.
 Q. Are you allowed to call anyone else?
 A. It's never been stipulated.
 Q. Have you called anyone else?
 A. Yeah, I've — I have called a few other people.
 Q. Have you been permitted to make long distance calls while you have been in the custody of the Providence Police?
 A. I have to make long distance calls, my family is out of state.
 Q. I'll rephrase the question. Apart from your family have you been permitted to make long distance calls to other people while you have been in the custody of the Providence Police?
 A. Yeah, I got one or two different relatives that live out of state that I call on occasion.
 Q. Apart from relatives, have you been permitted to make long distance calls to other people while in the custody of the Providence Police?
 A. No."
 Id., pp. 351-2.
 * * *
 "Q. Do you know a person by the name have (sic) Donna Orsi?
 A. Yes, I do.
 Q. Did she not visit you while you were in custody at the Providence Police Station?
 A. Not hardly.
 Q. She never did?
 A. No, sir.
 Q. Have you seen her during the past twenty-three months?
 A. Yes. She was locked up for prostitution and I saw her when they brought her in.
 Q. And when was this?
 A. Over a year ago.
 Q. Haven't seen her since?
 A. Nope. Excuse me, I seen her maybe twice. They brought her in for prostitution and that was approximately ten months to a year ago and I haven't seen her since.
 Q. Did she visit with you during that time?
 A. No. She was locked up."
 Id., pp. 372-3.
(2) At the trial on direct examination by the attorney for the state:
 "Q. I believe the question was would you explain the conditions under which you are now incarcerated.
 MR. GONNELLA: Objection to that.
 THE COURT: The Court will overrule the objection. You may answer the question.
 A. The conditions are that it's a situation where I have access to three rooms, windows are barred. I'm in an isolation sort of set up for most of the week which is I am by myself. I have an around-the-clock guard outside the door twenty-four hours a day. I have access to a refrigerator, a stove, so I can prepare my own meals, and I have my own television, my own VCR. They are my personal property and I pretty much can lay down on my bed whenever I want. I don't have a schedule. I don't have exercise periods. After a period of a week, I may — I may get to get out for a hour, two hours. That's basically what it is.
 Q. And are you allowed at any time to leave that three-room area without an armed guard?
 A. No. Whenever I leave the three-room area I have three armed guards."
 Id., pp. 682-3.
(3) On cross-examination by counsel for defendant Lawrence Mastrofine:
 "Q. You live in — when you're in the custody of the Providence Police they had you in three rooms, right, according to your description?
 A. Three-room cellblock.
 Q. Three-room cellblock. How many times have they taken you out to dinner, sir?
 A. In two years, twenty-five times.
 Q. Twenty-five, fifty times?
 A. Tops, yeah.
 Q. You think the inmates out at the ACI in prison get that type of treatment?
 MR. BURNS: Objection.
 THE COURT: Well, I'll overrule it. If he knows.
 Q. Do you know if they get three rooms with their own beds and their own stove and their own VCR and television?
 A. No, they don't get three rooms."
 Id., pp. 752-3.
(4) On cross-examination by counsel for John Broccoli:
 "Q. The taxpayers of the State of Rhode Island. You also stated that as part of your confinement you're in three rooms, that correct?
 A. I'm isolated in three rooms with bars on the windows.
 Q. I think you testified that you had a television in the room and you had a VCR in that room?
 A. Yes, I have my own VCR and my own television.
 Q. You have a stove?
 A. Stove, Yes.
 Q. For purposes of cooking?
 A. Yes.
 Q. You do your own meals at times?
 A. Yes, sir. Frozen dinners."
 Id., pp. 794-5.
 * * *
 "Q. So during your confinement you're in three rooms, you have a stove, you have a television, you have a VCR, you have been taken out to dinner, you have had overnight visits with your wife and you're paid fifteen to eighteen hundred dollars.
 MR. BURNS: Objection. It's somewhat a compound question.
 THE COURT: I'll overrule the objection. You may answer.
 A. Fifteen to eighteen hundred dollar takes care of my wife and children living expenses and the smaller part of that goes for what it costs to buy my food."
 Id., p. 797.
(5) On re-cross by counsel for Lawrence Mastrofine:
 "Q. Thank you. Do you know of your own personal knowledge whether or not the inmates in the ACI have three rooms each?
 A. No, but they also have exercise periods which I don't.
 Q. They have — in fact they are doubled and triple bunked up there?
 A. I lived in three rooms twenty-four hours a day for two years.
 Q. You have also gone out to eat on taxpayer's expense. By your own testimony twenty-five to fifty times, right?
 A. Yes, I have.
 Q. How many other detectives go out and sit down and eat on the taxpayers expense?
 A. They by (sic) their own food.
 Q. They buy their own food?
 A. Yes.
 Q. You had alcoholic beverages?
 A. No. I have had — I've had maybe seven beers in two years.
 Q. Seven beers in two years. And in addition to your wife staying over you have had what are referred to as conjugal visits?
 A. Yes."
 Id., p. 821.
Peter Gilbert's testimony in this trial was not fully truthful. It was substantially incomplete. He divulged neither his approved recreational activity nor his clandestine activity. His testimony described a far more restricted life style than he actually enjoyed. He falsely denied receiving cash from the Attorney General's disbursements. He did not disclose that some of his Florida trips included family visits. He did not reveal that his police-escorted excursions took him regularly to visit his mother, to sail on Narragansett Bay, to dine in nice restaurants in Newport and Boston as well as Jan's Place in Pawtucket, or that he visited parks and other recreation areas. He falsely denied using illegal drugs while in custody, and the question of his carrying a pistol never came up.
In the Valente murder trial Peter Gilbert substantially parroted his earlier testimony about his custody during direct examination:
 "Q. Would you explain the circumstances of your custody at this time?
 A. My family is kept in a undisclosed location in protective custody. Myself, I'm in a lockup situation, in the custody of the Providence Police Department. I have a 24-hour guard, seven days a week.
 Q. And describe the facility that you're in?
 A. I live in what could be described as a cellblock area. Bars on the window, there are three locked doors, successive locked doors, with a armed guard, and I have no access to the outside world or anything like that.
 Q. How many rooms do you stay in?
 A. Approximately three rooms that were turned into a living quarters sort of.
 Q. What do you have in those rooms:
 A. Basic furniture; a couch, a chair, a bed, a dresser for clothes. I have my own television, my own VCR which was my property; basic cooking utensils, a couple of pots and utensils, a refrigerator."
 Id., pp. 172-3.
On very ginger cross-examination he reiterated his well-known litany of grievances at the conditions of his confinement:
 "Q. And during the time that you are — how do you describe it, in a custody situation? How did you describe your confinement?
 A. I'm locked up.
 Q. In that three-room setting?
 A. I'm in a cellblock.
 Q. A three-room cellblock.
 A. A three-room cellblock with a couch and some chairs.
 A. Please.
 Q. With a couch?
 A. I have got a couch, a chair, a bed.
 Q. TV and VCR?
 A. The same thing they get, minus the couch.
 Q. The inmates get VCRs?
 A. I know they have color TV.
 Q. I'm asking about VCRs?
 A. I don't know about that.
 Q. You have your own stove and refrigerator?
 A. Yeah, that was in the apartment.
 Q. Would you agree that that is a rather generous result from your point of view?
 A. Mr. Anderson, I could tell you this, in two years I haven't had one night's sleep in two years. I'm right there where they lock all the drugs up, all the drug addicts up, so if that's unusual —
 Q. Let me put it this way, 10 years under those conditions, would you agree, is fairly generous given the charges pending against you?
 A. I don't think the conditions I live under are generous at all; far from generous.
 Q. More generous than 20 years?
 A. Well, timewise. I'm talking about the circumstances."
 Id., pp. 206-7.
On a brief redirect examination:
 "Q. During the testimony you said you were out — 25 to 50 times you had been out to eat.
 A. That was an approximation I gave in testimony. They keep going back to it.
 Q. Any of those times you went out alone?
 A. Never, police offers (sic) all the time.
 Q. You were never in the situation alone.?
 A. I have an armed guard 24 hours a day."
 Id., p. 234.
All of this testimony conceals that from the Gasbarro robbery trial to the Valente murder trial Peter Gilbert had spent his time in Florida and in congenial hotels and that he relaxed learning to sky-dive.
Mr. Dale Anderson was defense counsel for Mr. Mastracchio in the Valente murder trial. He received copies of the pretrial discovery furnished by the State to the defendants in the Gasbarro liquor store robbery case. He also sat in on the pretrial hearing regarding promises, rewards and inducements in January 1987. A transcript of the hearing was used by him along with the discovery documents to prepare his cross-examination of Peter Gilbert.
He explained that he did not question Peter Gilbert about such things as recreational outings or shopping trips, because he was under the impression that Peter Gilbert was in a 24-hour locked up situation. Obviously, so far as Mr. Anderson knew, such questions would have allowed Peter Gilbert to re-emphasize the restrictive quality of his custody. Mr. Anderson testified that he would have found the information about Peter Gilbert handling cash derived from the Attorney General's expense reimbursements important because he could have shown that Peter Gilbert had control over money. He also testified that he might have been able to use the vacation-like trips to Florida had he known about them. Of course, he would have used Peter Gilbert's sky-diving adventures to impeach credibility.
It is quite obvious that the relaxation of the security imposed on Peter Gilbert began between the two trials with his escorted but unguarded February 1987 trip to Florida. Within two days of his return on February 19, he began sky-diving. He began to be regarded as a "trusty" in the station. Mr. Anderson could no longer rely on the disclosures in the Gasbarro liquor store robbery as fairly describing Peter Gilbert's conditions of custody. The question is whether or not the State was justified in not volunteering information regarding those changes.
V. DUE PROCESS STANDARDS
Any analysis of the constitutional implications of the use of false evidence by the prosecution should begin with In reOuimette, 115 R.I. 169, 342 A.2d 250 (1975). In that case our Supreme Court conscientiously analyzed evolving due process doctrine pronounced by the United States Supreme Court culminating in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and implicating Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) along the way. It is clear that where there has been a deliberate deception of the court or jury by the presentation of known false testimony by the prosecutor, or by his knowing failure to correct false evidence or perjury, which though unsolicited is nonetheless put before the court, even if not directly concerned with the issue of defendant' guilt or innocence, but relating solely to the credibility of a state's witness, there has been a violation of due process requirements and the resulting conviction cannot stand. In re Ouimette, 115 R.I., at 174-5, 342 A.2d, at 252-3. The holdings in Ouimette do not deal with the question of the presentation of false testimony by a prosecutor which the prosecutor honestly believes to be true.
For guidance on that question it becomes necessary to look toLerner v. Moran, 542 A.2d 1089 (R.I. 1988). In that case, because this Court had rejected Lerner's application for post-conviction relief on the grounds both that (1) the perjury of the material witness in Lerner's prosecution did not rise above harmless error and (2) that the prosecutor at the trial was wholly without knowledge of the material witness' perjuries, the Supreme Court reversed only as to this Court's erroneous holding that the perjury was not material. The Supreme Court held:
 "Having determined that a serious due-process violation was brought about by Special Agent Rico, we need not address the question of imputation of the federal agent's acts to the state. The due-process issue is dispositive." Id., at 1093 (Emphasis supplied).
Paul Rico was a special agent of the Federal Bureau of Investigation, who was assigned to the investigation of the homicides of which Lerner was convicted. Special Agent Rico was found to have suborned the perjurious testimony of John S. Kelley, the State's chief witness, on the issue of what promises had been made to Kelley by the federal government in return for his testimony. Because of the holding of this Court, the only question for review on appeal in this regard was whether that perjury was material.
The Supreme Court treated Special Agent Rico as if he were the prosecutor and applied the "easy case" category of non-disclosure in the United States v. Keogh, 391 F.2d 138 (2d Cir. 1968) decision as adopted in In re Ouimette, supra. Since Special Agent Rico deliberately suppressed evidence of the perjury he had himself suborned, due process had been violated and Lerner's conviction was vacated. It is noteworthy that Special Agent Rico was never called as a witness at the post-conviction relief hearing and that all of the findings of fact regarding the perjury and its subornation were based on the testimony of the self-confessed perjurer himself. Since Special Agent Rico's conduct, irrespective of the prosecutor's knowledge, violated Lerner's right to due process at the trial, the Supreme Court did not need to decide whether Rico's knowledge was imputable to the prosecutor. Accordingly, the plaintiffs' citation of the Lerner v. Moran case for the proposition that the knowledge of members of the Providence police department must be imputed to the prosecutor in this case is misplaced. In addition, there is nothing in the evidence to suggest, as a matter of fact, that the conduct of any responsible Providence police officer renotely resembled the deliberate subornation of perjured testimony attributable to Special Agent Rico.
While there is a distinction between suppression by the prosecutor of exculpatory evidence and the knowing presentation of false evidence by the prosecutor, the latter always includes the former. The deliberate presentation of false evidence ordeliberately allowing it to stand uncorrected necessarily implies the knowing suppression of its falsity. The categories, or levels, of materiality set out in Keogh, supra, are meaningful only in cases involving suppression of perjured evidence which is not known to the prosecutor to be perjured.Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) requires a reversal in the case of deliberate conduct by the prosecutor regardless of materiality.
In Giglio v. United States, supra, the petitioner was convicted of passing forged money orders. The principal and sole incriminating witness against him was a bank teller who cashed the forged money orders. The witness testified at trial that he thought he could still be prosecuted. On appeal it was learned that an assistant United States attorney had promised the witness that he would not be prosecuted if he testified before the grand jury and at trial. This assistant district attorney did not inform his superiors or the assistant in the office who prosecuted the case at trial. The Supreme Court said:
 "In the circumstances shown by this record, neither DiPaolo's authority nor his failure to inform his superiors or his associates is controlling. Moreover whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the government. See Restatement (Second) of Agency § 272. See Also American Bar Association, Project on Standards for Criminal Justice, Discovery and Procedure Before Trial § 2.1(d). To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." 405 U.S., at 155, 92 S.Ct., at 765, 31 L.Ed.2d, at 107. (Emphasis supplied).
The last clause in this quotation implies that any lawyer in a prosecutor's office who deals with a case is chargeable with knowledge of what every other lawyer in the office has done with the case. The reason for such an implication is that a prosecutor's office is an entity. Extending that chargeability beyond agents of the entity is problematic at best. Giglio,
itself, cannot fairly be cited for any such an extension.
The plaintiffs cite a number of Federal and State appellate decisions which they claim support their position that knowledge of some police officers about the true circumstances about Peter Gilbert's custody is imputable to the prosecutor so that due process required him to correct Peter Gilbert's false testimony at the trial.
In State v. Carillo, 122 R.I. 392, 401-02, 407 A.2d 491, 497 (1979) our Supreme Court acknowledged the seriousness of knowing misrepresentation by a witness for the state even if the prosecuting attorney is unquestionably unaware of the falsehood. In that case an agent from the FBI laboratory testified falsely that he possessed a masters degree in zoology. The result turned on the resolution of the question of whether the agent's false testimony was material. The Supreme Court did not hold that the agent's knowledge that he was testifying falsely was imputable to the prosecutor, so that the defendant was denied due process. The case was no different from any other case where after conviction it is discovered that a witness for the State has testified falsely. It is also noteworthy that the Supreme Court did not at all advert to In re Ouimette, supra, decided four years earlier as it would have if it regarded Carillo as a suppression or non-disclosure case.
In Schneider v. Estelle, 552 F.2d 593 (5th Cir. 1977) a state law enforcement officer was alleged to have committed deliberate perjury in the trial in which the petitioner for Federal habeas corpus relief was convicted. The Court of Appeals remanded the case for an evidentiary hearing, holding in pertinent part:
 "If the state through its law enforcement agents suborns perjury for use at the trial, a constitutional due process claim would not be defeated merely because the prosecuting attorney was not personally aware of this prosecutorial activity." Id., at 595.
The holding in United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973) that the Government could not refuse a "Brady"
request to produce a personnel file from the Post Office because it did not have possession of the file is beside the point. There is no suggestion in that case that the knowledge of any postal clerk in the United States was attributable to the prosecution. In Martinez v. Wainwright, 621 F.2d 184 (5th Cir. 1980) the defendant was convicted in a state court of murder. He specifically requested the deceased's rap sheet. The prosecuting attorney denied any knowledge of such a rap sheet and assured the trial court that he had pursued all known avenues of obtaining one. In fact the victim had an extensive criminal record and his FBI rap sheet "resided in the medical examiner's office throughout the trial." The Court held: "That the prosecutor was personally unaware of the existence of the rap sheet does not excuse his misrepresentation to the trial court that a rap sheet was unavailable." Id., at 187. In that case there was a specific request by the defense and a negligent misrepresentation by the prosecutor, regarding an official document in official possession of a state agency. The case does not hold that the knowledge of the state medical examiner is imputable to the prosecutor. To like effect is United States v. Perdomo,929 F.2d 967, 971 (3d Cir. 1991) which held that a prosecution witness' criminal record in the Virgin Islands was available to a Federal prosecutor in the Virgin Islands, and should have been produced.
In United States v. Antone, 603 F.2d 566 (5th Cir. 1979), on appeal from the trial court's denial of a post-conviction motion for a new trial, the principal witness for the government had testified falsely at the trial that he had paid for private counsel out of his own funds when in fact counsel had been paid by the state. Florida state investigators knew about the falsehood. Federal agents and prosecutors were unaware of the truth. In that case state and federal governments had pooled their investigative efforts. The Court held:
 "We have little difficulty in concluding that the state investigators functioned as agents of the federal government under the principles of agency law utilized in Giglio. The state agents were in a real sense members of the prosecutorial team." Id.,
at 570.
The Antone case is very similar to Lerner v. Moran, supra,
with the respective governments reversed. While the Florida state law enforcement officers did not suborn the witness' perjury, they clearly made it possible. Their conduct could also be said to have kept the truth from the trial jury.
In United States v. Brooks, 966 F.2d 1500 (D.C. Cir. 1992) the Court confronted the question of whether or not the disclosure requirements of Brady required the prosecution to search police files concerning a homicide victim for exculpatory evidence. The Court joined United States Courts of Appeal in the 3rd, 5th and 7th circuits in finding that the Brady duty of disclosure includes a duty to search accessible sources for possibly exculpatory information. Noting the close working relationship between the Washington metropolitan police and U.S. Attorney for the District of Columbia, especially in the particular case before the Court, it was held that "the duty must reach the police department's homicide and Internal Affairs Division files." Id., at p. 1503. It is noteworthy that in this case, like in Martinez v. Wainwright, supra, the prosecutor inadvertently suggested to the trial court in response to a specific request for information from the police files that there was no Internal Affairs Division file. The State in this case accepts the Brooks ruling. State's Consolidated Memorandum ofLaw in Apposition to Petitioners' Applications forPost-Conviction Relief, p. 46. The plaintiffs' argument that Peter Gilbert's clandestine activity, so carefully concealed from police authorities whom Peter Gilbert did not trust, and from the trial prosecutors, was as readily accessible to the prosecution as the contents of an official police file within the prosecutor's jurisdiction is unworthy of extended consideration.
The plaintiffs' reliance on Ex parte Castellano, 863 S.W.2d 476
(Tex. Ct. App. 1993) is also misplaced. In that case the applicant for habeas corpus relief had been convicted of arson. The principal witness for the state was found to have altered tape recordings of conversations so as to incriminate the applicant with the assistance of and in conspiracy with a member of the San Antonio police department. The prosecutor was found not to have direct knowledge of the perjured testimony at the time of trial. The State on appeal argued that the knowledge of the police officer could not be imputed to the State because he was not a member of the "prosecution team" because he was not operating "under color of law." The Court found that the San Antonio police officer in fact participated considerably and officially in the investigation which led to the defendant's conviction. He attempted to enlist a witness. He aided in altering the tape. He instigated criminal proceedings by approaching arson investigators. He interrogated the arson victim. Finding that the police officer, notwithstanding his private motivation, "acted under color of law and was, therefore, a member of the prosecution team in the investigation of the instant case and as such his knowledge of the perjured testimony was imputable to the prosecution." (Emphasis supplied.)Id., at 485. The Castellano case, although framed in terms of imputed knowledge, is actually in the Lerner v. Moran class where the perjury is instigated by a law enforcement officer so closely connected with the investigation of the crime for which the defendant is prosecuted that the defendant is denied due process, whether the prosecuting attorney is aware of the perjury or not. In other words, the perjury is imputed directly to the State and not necessarily thru the prosecutor.
There is nothing in this case which suggests that any police officer suborned, instigated or encouraged Peter Gilbert to withhold any evidence about his custody from the court and jury. In this case we cannot base any due process violation on Peter Gilbert's clandestine and possibly criminal conduct like carrying a pistol, smoking marijuana, roaming the stationhouse, fraternizing with female prisoners, and gallivanting on midnight rides with Mr. Norato and others, all of which was deliberately concealed from police superiors and the prosecutors. We should here consider only those matters that were reasonably well known to the officers in charge of Peter Gilbert's custody, who were in fairly regular communication with the prosecutor.
By the time of the Valente murder trial, both Lt. Tamburini and Sgt. Oates knew that the conditions of Peter Gilbert's "confinement" were far more liberal than he disclosed during that trial and during the earlier Gasbarro robbery trial. Both police officers were part of the "prosecution team" because they were in charge of Peter Gilbert's custody, had supervised his debriefing and had advised the State police when Peter Gilbert provided potential evidence in the Valente murder investigation.
As of the Gasbarro robbery trial they knew that Peter Gilbert regularly left the police station with a security escort on recreational excursions. They also knew that he had cash on his person which he derived from the Attorney General's reimbursement checks. They were aware, as was the prosecutor, as well as the plaintiffs, that Peter Gilbert had regular extended contact with his wife and children, even though the regularity and extent of those visits were never made clear to the plaintiffs.
By the time of the Valente murder trial both these police officers and the prosecution were aware that in the interim between trials Peter Gilbert had spent more time in hotels than in the police station. The police officers knew as well about his sky-diving activity. All of which was unknown to Mastracchio's defense counsel, whose cross-examination might have been less gingerly if he had known.
Deliberately suborned perjury by a law enforcement officer directly involved with the prosecution, as in Lerner orCastellano or Schneider or Antone, resulting in a conviction, is a denial of an accused's right to due process. A knowing silence by involved law enforcement officers is an equal violation where a witness perjures himself or herself with the same results. Cf. Napue v. Illinois, supra. There are some such cases, which on their facts do show that police silence in the face of blatant perjury amounts to outright connivance, but this case is not one of them. Because it is not, it is not the "easy" case described in Lerner, 542 A.2d, at 1092, derived from Keogh, 391 F.2d at 146-47. And so, we must next consider materiality.
VI. MATERIALITY
The State argues that the issue of the materiality of the undisclosed favorable conditions has already been decided by our Supreme Court in a collateral proceeding involving one of these plaintiffs. See State v. Mastracchio, 605 A.2d 489, 493-94 (R.I. 1992). At the original direct appeal from his conviction, Mastracchio successfully argued that at the time of the Valente murder he was a juvenile and not subject to trial in this Court unless the Family Court waived jurisdiction. The Supreme Court remanded the case to this Court for hearing before the trial justice on the question of whether the Family Court would have waived jurisdiction, if it had heard the matter at the time the murder occurred. Included among the exhibits at the waiver hearing was a transcript of the trial evidence. That transcript, of course, featured the testimony of Peter Gilbert, admissible at the hearing under R.I.R. Evid. 804(b)(1).
On the very first day of the reconstituted waiver hearing, the defendant objected to the admission of Peter Gilbert's testimony unless he was afforded an opportunity to impeach Peter Gilbert's credibility by evidence of his false testimony at the trial. Mastracchio Trans., March 2, 1989, p. 8. On May 18, 1989 the State produced the Gorman report to defendant's counsel.Mastracchio Trans., May 18, 1989, p. 15. On September 19, 1989 the defendant urged the Court to consider the information in the Gorman report regarding Peter Gilbert's life during the sixty days preceding his trial testimony: staying in hotels, vacationing in Florida and beginning his sky-diving. He urged the Court to consider Peter Gilbert's false denial of receiving cash from the Attorney General's reimbursement of his expenses.Mastracchio Trans., September 19, 1989, pp. 7-19. On September 22, 1989, Walter Gorman's subpoena was quashed because his evidence was considered not relevant, and an application to consolidate this post-conviction relief proceeding with the waiver hearing was also denied by the Court. MastracchioTrans., September 22, 1989, pp. 7-9. On February 15, 1990, this Court ruled that the Family Court would have waived jurisdiction over the defendant. The second direct appeal ensued.
The Supreme Court observed:
 "The evidence defendant vigorously offered at the waiver hearing to impeach Gilbert's credibility would have tended to establish that Gilbert had not truthfully described his living situation when he testified for the state. The evidence offered for impeachment was information that came to public knowledge following Gilbert's sudden death while in the State of Connecticut while not in the custody of any law enforcement personnel and in circumstances that were bizarre, to say the least. Those circumstances would indicate that at some point Gilbert's custodial circumstances had become far different from, far less restricted than those he described to the jury. In fact Gilbert had apparently traveled out of state, alone, on more than one occasion. However, the jury had already been informed not only that Gilbert was a convicted felon in Maine, Florida, and Massachusetts, had escaped from a Florida prison, and had violated condition of probation several times, but also that on his arrest in Rhode Island he implicated himself in three murders and a robbery with which he had not previously been charged and had made an agreement with the authorities for a disposition of all those charges, which agreement was extremely favorable to him. In view of what the jury already knew about Gilbert, it seems highly unlikely that the new evidence would have so impeached his credibility with the jurors, that they would not have believed his testimony about defendant's admissions regarding the Valente murder. The impeaching evidence was more in the nature of cumulative evidence and would not really qualify as new evidence." Id.
The plaintiffs correctly point out that the relative credibility of Peter Gilbert's trial testimony was not material to the waiver issue as heard by this Court and as reviewed on appeal by the Supreme Court. The issue at that hearing was whether or not there was probable cause to believe that the accused had committed the offense as a juvenile. The test is whether or not there was evidence, which, if believed by thejury, could support a verdict of guilt. Even assuming that Peter Gilbert had lied about the circumstances of his custody and even if the jury had learned both of his false testimony and the favorable nature of his confinement, all of that would still only be circumstantial evidence of the falsity of his incriminating testimony against the defendant to be considered along with all the evidence bearing on the witness' credibility. And so, when the Supreme Court volunteered the observation that: "In view of what the jury already knew about Gilbert, it seems highly unlikely that the new evidence would have so impeached his credibility with the jurors, that they would not have believed his testimony about defendant's admissions regarding the Valente murder," it was referring to a level of impeachment such that it would not be possible for a reasonable juror to accord him any credibility whatsoever. The pertinent test at that hearing was merely whether the jurors could have reasonably believed Peter Gilbert's material testimony at all.
Since we have decided that this is not an easy case in theKeogh trichotomy, the claims of the plaintiffs must rely on some standard of materiality. Plaintiffs Mastrofine and Broccoli requested a disclosure of promises, inducement and rewards. As to them, the State undertook to disclose the sentencing agreement and the financial arrangements by formal written filings on January 6 and October 31, 1986 and by submitting Peter Gilbert to examination under oath at a preliminary hearing.
The Court has already found the written formal disclosures to be substantially accurate. It was Peter Gilbert's testimony under oath both at the disclosure hearing and at the trial which is challenged as false or misleading. This Court has found that Peter Gilbert's testimony regarding his sentencing agreement to be completely accurate and his description of his financial arrangement to be substantially accurate, except that he was not truthful when he denied seeing any cash derived from the Attorney General.
The Court has also found, however, that his testimony regarding the conditions of his custody was false and misleading. The Court has likewise found that, while the prosecutor and his immediate staff had no reason to believe that Peter Gilbert's custody was anything other than what he described, the police officers, who were responsible for his custody, were aware of some of his activities which substantially mitigated the severity of his security. As to these plaintiffs the materiality standard to be applied is that of the second class in Keogh, where a general request is made, but nondisclosure is inadvertent in the sense that the prosecutor would have disclosed the truth had he known, and the police investigators would have disclosed it to the prosecutor had they known it was sought.
In such a case, according to Keogh, some standard is retained but without precise definition. Keogh, supra, at 147. Since the standard of materiality is not defined in Keogh,
this Court will apply the standard announced in United States v.Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), which has been cited with approval as an alternative ("even if") basis for decision by our Supreme Court, even where it chose to apply Keogh standards, Cf. State v. Wyche,518 A.2d 907, 910 (R.I. 1986); Lerner v. Moran, supra, 542 A.2d, at 1092; and followed with modifications in In re Ouimette,supra; and State v. Burke, 574 A.2d 1217, 1226 (R.I. 1990), where there is no request and nondisclosure is unintentional.
 "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, supra, 473 U.S., at 682, 105 S.Ct., at 3383, 87 L.Ed.2d, at ___.
This Court is aware that our Supreme Court favors materiality threshholds based on the degree of prosecutorial culpability rather than confidence in the outcome of the trial. Prosecutorial culpability, especially where it includes responsibility for the conduct of investigators not under the prosecutor's control, can include many degrees along a spectrum from the Lerner extreme to the Burke end. Where the conduct of the prosecutor, or the prosecution team, is something less than a deliberate perversion of the fair trial concept implicit in due process, that conduct can take many forms ranging from pure innocence to callous indifference. This Court finds it difficult to proportion the relative misconduct of the prosecutor to the relative unfairness of the trial. For example, can the Court let stand a conviction based on blatant confessed perjury, if the whole prosecution team was totally innocent? On the other hand, should the Court void a conviction where a prosecutor recklessly let a material witness lie with respect to an irrelevant detail? This Court will apply the Bagley standard and would urge our Supreme Court to reconsider its mild disfavor of that standard, if the issue comes before it.
VII. PROBABILITY OF A DIFFERENT RESULT
There is really only one form of impeaching evidence which was withheld from the plaintiffs by non-disclosure by the prosecution and perjury by Peter Gilbert. Evidence of favorable treatment by the State of a material witness facing criminal charges is always admissible to prove bias, prejudice, interest or motive by the witness to fabricate testimony favorable to the State. Cf. State v. Anthony, 448 A.2d 744, 756 (R.I. 1982) andState v. Anthony, 422 A.2d 921, 924 (R.I. 1980). The argument is that testimony offered as a quid pro quo for favorable treatment by the State lacks the credibility which would ordinarily be accorded to disinterested testimony from a witness who has nothing personal to gain from testifying. The correlative argument is that the greater the favorable treatment the less reliable the testimony.
Although the highly favorable sentencing disposition, including immunity from prosecution in the Gasbarro liquor store robbery trial, both for the crimes in which Peter Gilbert was an accomplice as well as others, was fully disclosed to the defendants and presented to the trial jury, the plaintiffs had a clearly established right to show the jury that the conditions of Peter Gilbert's confinement for his many offenses were far more lenient than had actually been presented. They argue that his credibility, already weakened or strained by the disclosure of great leniency in his favor would have been destroyed had the factfinders known the truth. The State argues that, conversely, if the jury chose to accept Peter Gilbert's testimony in spite of the disclosure to them of the great leniency extended to him for serious criminality they would not be likely to reject it for the minimal enhancements withheld from them. Added to all that was the fact that the jury knew that Peter Gilbert was a drug pusher and career criminal. It is the "drop-in-the-bucket" position of the State verses the "straw-that-breaks-the-camel's-back" argument of the plaintiffs.
After a careful consideration of the records of both trials and giving some weight to the observations of the trial judge who occupied a "ring-side seat" at the presentation of Peter Gilbert's testimony, this Court concludes that Peter Gilbert's credibility would have been impaired incrementally at both trials if all of the true circumstances of his custody, as known to the prosecution team, had been presented to the jury.
Whether that impairment was so great as to lead to a complete rejection of his material testimony is intertwined inextricably with the ultimate question of the weight of all the evidence. If there was other evidence substantially establishing the guilt of the accused, the jury would most likely find that Peter Gilbert's credibility was not so morally impaired as to discredit him entirely and would most likely accept his material testimony as credible. In this context the Court has in mind that impeachment on the grounds of bias, prejudice, interest or improper motivation is, after all, indirect evidence impacting credibility. The witness' material evidence in such a case is not directly impeached by evidence of contradiction, inconsistency, failure of testimonial competence, impossibility and the like. A jury is not required to reject even the most biased, prejudiced or improperly motivated witness.
These conclusions dictate different results for these plaintiffs. As to the plaintiffs John Broccoli and Lawrence Mastrofine, there was an abundance of evidence, independent of Peter Gilbert's testimony, which supported their conviction. John Broccoli was implicated by the testimony of Steven DiPaolo, an "inside" confederate employed in the store, and by the testimony of James Bennett, who testified to damaging admissions Broccoli made while he was incarcerated waiting trial. DiPaolo corroborated Peter Gilbert's testimony regarding planning the robbery together with John Broccoli. Silva Trans., Vol. IV, p. 833. James Bennett also corroborated Peter Gilbert's testimony. Id., Vol. V, p. 947-48. Lawrence Mastrofine was identified by both the victim Lombard Gasbarro and Steven DiPaolo as one of the perpetrators of the actual holdup. James Bennett also corroborated Lawrence Mastrofine's participation in the robbery through a conversation between Mr. Mastrofine and Mr. Broccoli. Silva Trans., Vol. V, p. 951. Lawrence Mastrofine testified in his own behalf. Indirectly, his testimony corroborated that of Peter Gilbert, known to him as Gary Gilbert. Peter Gilbert was known to Mr. Mastrofine, who purchased illegal drugs from him. He and Peter Gilbert were associated in the use of a storefront on Broad Street and they were both connected with a distinctive registration plate "TATTOO 1." On the day of the robbery he was in Peter Gilbert's company, but, according to his testimony, only after the robbery had been committed.
Considering the whole record of the trial of John Broccoli and Lawrence Mastrofine there was enough evidence, even without Peter Gilbert's testimony, to convict them both. Because of corroborating testimony from other witnesses, and indirectly from Lawrence Mastrofine himself, the jury probably would have accepted Peter Gilbert's material testimony even if it had known the whole truth about his favorable treatment by the State. As a result, the Court finds that there is no reasonable probability that a different result would have been reached, if the true circumstances of Peter Gilbert's custody had been disclosed to the jury at the trials of John Broccoli and Lawrence Mastrofine. Their applications for post-conviction relief must be denied.
Gerald S. Mastracchio is in a different position from the other plaintiffs. While it is true, as observed by our Supreme Court, that the jury could have believed Peter Gilbert, even if it had known about the benefactions lavished on him by his custodians, on this proceeding we ask a different question. Was it reasonably probable that a different result would have been reached if Peter Gilbert's testimony had been impeached by the exposition of the true circumstances of his custody so far as was known to his police custodians and should have been known to the prosecutor? Can we have enough confidence in the verdict to disregard the false and misleading testimony?
If we apply the same analysis to the prosecution of Gerald S. Mastracchio as we did to that of the other plaintiffs, the answer is ineluctable. His conviction depended exclusively on the testimony of Peter Gilbert. There was no substantial external corroboration of any of Peter Gilbert's material testimony in the Valente murder trial, as there was in the Gasbarro robbery trial. The jury was left to accept or reject Peter Gilbert's story whole. In the absence of corroboration it would be easier to reject his testimony. It would take less impeachment to overcome it than in the Gasbarro liquor store robbery trial.
Once Peter Gilbert's material testimony fails the credibility test, there is nothing left for the jury to do in the Valente case. In the trial of Broccoli and Mastrofine, even if the jury were to conclude that Peter Gilbert's testimony was weakened by impeachment, it still had strong unimpeached material and substantial testimony from other witnesses. There was none such in the Valente murder case.
It is never easy to set aside the verdict of a jury. A conviction twice reviewed and approved by our Supreme Court has a right to finality. None of these considerations will let us flinch from our constitutional duty to insist on a fair trial under due process standards. Gerald S. Mastracchio, guilty or not, did not get such a trial. His application for relief will be granted. His judgment of conviction on Indictment number P1/85-3173 will be set aside and vacated. He will be granted a new trial.
Each prevailing party will submit a final judgment for entry separately in each respective action upon notice to the adverse party.